WILLIAM J. DURGIN (AND 9 OTHERS), PLAINTIFFS-RESPONDENTS, v. JOHN E. BROWN (AND 6 OTHERS), AND THE BOARD OF EDUCATION OF THE WESTWOOD CONSOLIDATED SCHOOL DISTRICT, DEFENDANTS-APPELLANTS.

Argued February 6, 1962—Decided April 2, 1962.

Mr. *Milton T. Lasher* argued the cause for defendants-appellants (Mr. *William De Lorenzo, Jr.,* attorney).

Mr. *Irving C. Evers* argued the cause for plaintiffs-respondents (Mr. *Jacob Schneider,* attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. This appeal is from a judgment of the Superior Court, Law Division, (1) ordering the Board of Education of the Westwood Consolidated School District (herein Board) to erect a senior high school and (2) declaring invalid a resolution of the Board directing its attorney to prepare a legislative bill for the deconsolidation of the district. We certified the matter before the Appellate Division acted upon it.

The controversy has a long history. The school district was created in 1951, upon elections held in the Borough of Westwood (herein Borough) and Washington Township (herein Township). *N. J. S. A.* 18:5–17.1 *et seq.* Within a few years discontent arose in the Borough. The reason was the rapid increase in the population of the Township, which, the dissidents felt, led to a greater tax burden than would be theirs if the union were dissolved.

There being no statutory authorization for deconsolidation, the governing body of the Borough sought to persuade the Legislature to permit it. In September 1958 the Borough passed a resolution to submit to its voters the question, "Should any action be considered to effect a deconsolidation * * * ?" The submission of the question was enjoined, the Appellate Division holding that since the governing body of the Borough had no power to legislate in this area, it could not seek an advisory referendum under *N. J. S. A.* 19:37–1, which permits a municipality thus "to ascertain the sentiment of the legal voters * * * upon any question or policy pertaining to the government or internal affairs thereof." *Bolkin v. Westwood,* 52 *N. J. Super.* 416 (1958), appeal dismissed, 28 *N. J.* 218 (1958).

The need to expand school facilities was clear. After several studies, the Board adopted proposals (1) to build a senior high school and (2) to build an elementary school, both in the Township. The cost was to be financed by a bond issue. By reason of the debt limitations of *N. J. S. A.* 18:5–84, the consents of the State Commissioner of Educa-

tion and of the Local Government Board had to be obtained, *N. J. S. A.* 18:5–86, prior to the submission of the proposals to the voters of the school district. The required consents were given. On December 9, 1959 the referendum was carried by a vote of 2,189 to 1,960. In the Township the vote was 1,345 to 117 for the proposals, while in the Borough the vote was 844 to 1,843 against. Thereupon taxpayers of the Borough appealed without success from the consents given by the State Commissioner of Education and the Local Government Board. *Schinck v. Board of Education of the Westwood Consolidated School District,* 60 *N. J. Super.* 448 (*App. Div.* 1960).

The membership of the school board consisted of eight elected in the Borough and one in the Township, the distribution being based upon the census of 1950. Despite the preponderant representation from the Borough, the Board had determined the welfare of the school district required the improvements embodied in the proposals thus supported by the referendum vote. But in February 1960, while *Schinck* was pending, there was an election in the Borough for four seats upon the Board. Candidates who ran on a platform for deconsolidation and a pledge to retain the senior high school in the Borough prevailed by a vote of 2 to 1. A majority of the Board took its cue from these returns. It became plain that the Board would not execute the proposals approved by the referendum.

The Board asked the Senator and Assemblymen from Bergen County to sponsor legislation for deconsolidation, and when an Assemblyman requested a suggested bill, the Board on April 13, 1960, by a vote of 7 to 1, adopted a resolution directing its attorney to prepare a measure. Meanwhile, citizens having complained to the State Commissioner of Education of the Board's failure to proceed, he advised the Board by letter of April 7, 1960 that he would investigate the delay. At its meeting of April 13, at which the Board adopted the resolution just referred to, the Board, by a vote of 7 to 1, authorized a letter to

the State Commissioner summing up the Board's position in these words:

"So that the Commissioner will be aided in his investigation we should like to state that the majority of the Board have individually stated that they do not intend to move the High School from Westwood. Should this be what is disturbing the Commissioner and some of the residents of this district, we would like to state that the candidates recently elected to office in February ran on a ticket advocating deconsolidation of the district and promising that they would not allow the high school to be removed from Westwood. In furtherance of the promises, this Board has recently written a letter to our State Senator and Assembly requesting their aid in introducing a bill permitting deconsolidation. The Board's action was supported by the 2 to 1 vote given the recently elected candidates running on such platform. Should the Commissioner question the action taken by the majority members of this Board, we quote the following from the case of *Botkin v. Westwood*, 52 *N. J. Super.* 416 which states at *page* 432, 'That segment of the Borough's population favoring deconsolidation is not without proper means to raise the question and have it determined. As is usual in a representative form of government, candidates for the consolidated district board of Education can run for office on that issue and if there is ultimately elected a majority of the board favoring such action, the Board can take steps to attempt to secure legislation or otherwise resolve the problem fairly and in an appropriate manner. It will thereby be considered by the body to which the law has committed such matters. In the meantime, local sentiment can undoubtedly be ascertained by interested civic groups or organizations through postal questionnaire or similar means, if such an expression is thought desirable.' "

We will later comment upon the Board's reference to *Botkin v. Westwood*.

The State Commissioner dispatched his staff to the school district, and on June 28, 1960 he sent the Board a copy of the report of the study. The report concluded that the school district should "proceed immediately to carry out the program as approved by the voters for the expansion of the educational facilities."

The Board nonetheless declined to build the new senior. high school. The present suit, to compel it to do so, was started in August 1960. On November 21, 1960 the Board engaged an educational consultant, Dr. William K. Wilson, to make a study, but under a specific direction which would

fulfill the Board's determination to keep the senior high school in the Borough. Dr. Wilson recommended a program on the basis of this restriction, although he conceded his recommendations would be different if he had had a free hand.

At the trial of the present case, it appeared that the Board had sought to place the Wilson plan before the State Commissioner of Education who however declined to consider it because of the pendency of this suit. In an effort to conclude the controversy, the trial court suggested the new plan be presented to the Commissioner under an agreement that if he disapproved it, the Board would promptly execute the proposals adopted at the referendum. The suggestion was accepted, with however the proviso that the trial court would review an adverse ruling by the Commissioner if the Board should charge it to be arbitrary.

The Board then adopted a resolution proposing to renovate the existing high school in the Borough, to acquire lands adjacent to its site, and to erect a junior high school and an administration building in the Township. This new proposal, based on the Wilson report, was submitted to the Commissioner.

The Commissioner held a hearing. He disapproved the new plan, concluding it did not meet the condition in *N. J. S. A.* 18:5–86(c) that "there is no alternative method of providing such new educational facilities which would be more economical." The Commissioner concluded the proposed use of the existing high school lacked flexibility for future development; that the cost of rehabilitating the high school, part of which was about 50 years old, was excessive and uneconomical in view of the limitations upon its use for a modern senior-high-school educational program; that the proposed plan was basically concerned with housing, as such, rather than the quality of the educational program; that while there might be some immediate cash saving, the plan did not provide "an efficient· long-range flexible economical solution to your secondary school housing problem";

and hence the plan was not the most economical method of providing new educational facilities.

The trial was then resumed. The Board asked the trial court to review the Commissioner's action on the ground that it was arbitrary. The court did review it and found the challenge was not sustained.

Upon the conclusion of the case, the court held the Board was arbitrary in its refusal to execute the program approved by the referendum and ordered the Board to proceed with it. With respect to the other issue in the case, the validity of the resolution directing the attorney for the Board to prepare a legislative bill for deconsolidation, the court found the Board exceeded its power.

## I.

The present *Constitution* (*Art.* VIII, § IV, *par.* 1) directs, as did its predecessor (*Art.* IV, § VII, *par.* 6), that:

"The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years."

Pursuant to this mandate, the Legislature prescribed a comprehensive scheme whereby such education would be furnished by boards of education within their respective school districts. *R. S.* 18:11-1 commands that each school district "shall provide suitable school facilities and accommodations for all children who reside in the district and desire to attend the public schools therein."

## A.

The issue is whether the trial court erred in ordering the Board to carry out the proposal approved by the referendum vote.

■ The Board first contends the sole remedy for a failure to comply with the mandate of *R. S.* 18:11–1 for "suitable" facilities, is the withholding of school aid under *N. J. S. A.* 18:11–2. But the Legislature did not say or intimate that this administrative measure should be the exclusive consequence. Moreover, we are not concerned with an original failure to deal with a need, but rather with the question whether a board must proceed with a plan for facilities which it did prepare and which the electorate approved.

Alternatively, the Board contends the referendum in nowise limited its broad discretion to decide what facilities are "suitable," and hence, notwithstanding the vote, it may consider the problem anew. The Board argues that since *N. J. S. A.* 18:5–86(a) provides that a "school district, upon compliance with the provisions of this section, may *authorize* the issuance of bonds," (emphasis added) the vote merely empowers the Board to act, without compelling it to do so. It cites *State v. Wenom,* 326 *Mo.* 352, 32 *S. W. 2d* 59 (*Sup. Ct.* 1930), which lends some color to that view; but see *Goedde v. Community Unit School District No. 7, Macoupin County,* 21 *Ill. App. 2d* 79, 157 *N. E. 2d* 266 (*App. Ct.* 1959); *Schouweiler v. Allen,* 17 *N. D.* 510, 117 *N. W.* 866 (*Sup. Ct.* 1908); *Orr v. Marrs,* 47 *S. W. 2d* 440 (*Tex. Civ. App.* 1932), application for writ dismissed, 52 *S. W. 2d* 53 (*Tex. Sup. Ct.* 1932).

■ But in the last analysis, whether a statute is mandatory despite words which, abstractly, may be permissive, depends upon the intent of the Legislature, gathered from the context in which the words appear. *Harvey v. Essex County Board of Chosen Freeholders,* 30 *N. J.* 381, 391 (1959); *Montclair v. Baxter,* 76 *N. J. L.* 68, 69 (*Sup. Ct.* 1908). So, the word "authorize" has been found to be peremptory. *State v. Newark,* 28 *N. J. L.* 491 (*Sup. Ct.* 1860).

Hence we must look for the sense of the statutory scheme. We start with the proposition that ordinarily the object of an election is to ascertain the *will* of the electorate. Where

the Legislature intended a non-binding referendum, it couched that purpose in unmistakable terms. See *N. J. S. A.* 19:37-1, discussed in *Botkin, supra* (52 *N. J. Super.* 416). Here there is no language suggesting the referendum is a mere sounding of popular sentiment.

 Nor does the referendum serve to vest in local government the *power* to deal with a problem. That power was already granted to the Board by *R. S.* 18:11-1 mentioned above. Rather *N. J. S. A.* 18:5-86 contemplates that the Board first exercise that power by adopting a specific plan; that consents be then obtained from the State Commissioner of Education and the Local Government Board; and finally, that the specific plan receive the voters' stamp of approval. This sequence of events negates an intention that the referendum be merely advisory. Moreover, an advisory referendum is a tool which local government may but need not use, whereas here the referendum is required.

In these circumstances, the Legislature could hardly have meant that, notwithstanding the election, the Board may change its mind with the freedom it would have if its discretion alone were involved. Rather we think the Legislature committed the final judgment to the voters.

This is not to say that the vote upon the referendum must be obeyed no matter what may later ensue. We may assume the Legislature intended some residual power to meet the extraordinary or unexpected. One can conceive of supervening events which so nullify the premise upon which the vote was had, that discretion remains in the Board to seek relief from the mandate in the public interest. But to rehash the merits of the policy decision which was submitted to the electorate and to decline to fulfill its will because the same or new members of the Board now prefer another program is something else. The time for the Board's decision upon such matters was before the vote. When the voters approved the proposals, the debate upon policy was ended.

Here it is not claimed that something occurred which reasonably suggested that the electorate would wish to be relieved of its. decision. Rather, there was an election of new members pledged to seek deconsolidation and to keep the high·school in the Borough in any event. With this "instruction" from but a part of the school district, the majority of the Board, elected from the Borough, embarked upon an obvious course of frustration of the will of the whole district.

It may well be that the individual members acted in good faith in the sense that they believed their official duty was to the section which voted them into office, but if such was their thinking, they misconceived their duty. The Board is an instrumentality of the State itself, 78 *C. J. S., Schools and School Districts* § 24, *p.* 656, obligated to meet the educational needs of the children of the whole district. The Legislature provided for elections of members from constituent municipalities to the end that the interests of all may be known and reflected. It did not, by that mode of selection, suggest the members of the Board have anything less than an undivided duty to the whole. See *McDonough v. Roach,* 35 *N. J.* 153, 158 (1961).

Hence we find no justification for the Board's refusal to proceed. It did not have the discretion to revisit the scene and reconsider what had been decided. We add that if such discretion could be found, the evidence would lead inescapably to the conclusion that the new view was with a jaundiced eye. The Board started with a determination to keep the high school in the Borough and simply sought to build a case on that premise without regard to the interests of the entire school district. This is evident from the excerpt quoted above from the letter to the State Commissioner which the Board authorized at its meeting of April 13, 1960.

It will be recalled that in that letter the majority of the Board claimed its course was supported by *Botkin v. Westwood, supra* (52 *N. J. Super.,* at *p.* 432). There the

Appellate Division simply noted that if the sentiment of the residents of the Borough was desired with respect to deconsolidation, candidates might run for office on that platform, and the resulting vote could be communicated to the Legislature. The opinion did not suggest the Board could renounce its duty to the entire district or subordinate the will of the district to the wish of a part of it.

### B.

The Board contends the trial court erred in overruling its charge that the Commissioner was arbitrary in his refusal to consent to the substitute proposal.

In the light of the conclusions we have reached, the correctness of the Commissioner's decision seems of no moment. If the Board was bound to proceed with the original proposal, it is not important whether the Commissioner correctly refused to consent to the substitute plan.

The precise role of the submission to the Commissioner during the trial of the case is somewhat obscure. The trial court had in mind something in the nature of a settlement, the parties to abide by the Commissioner's decision as to the substitute plan. An element of uncertainty was later added when a controversy developed as to what the agreement really meant.

The view of the arrangement, most favorable to the Board, would be that with court approval the parties reached an agreement of settlement which should be enforced even though the Board had no lawful defense to the primary claim. Upon that hypothesis, however, the Board is nonetheless bound to execute the original proposal for the reason that the Commissioner's action was not unreasonable.

The main thrust of the attack upon the Commissioner's refusal to consent to the substitute plan is that he misconceived his role under *N. J. S. A.* 18:5–86. Subsection (c) thereof provides the Commissioner shall endorse his consent,

"* * * if he shall be satisfied * * * that existing educational facilities in such school district are or within 5 years will be less than 80% adequate, that the new educational facilities to be financed pursuant to such proposal or ordinance will within 10 years be fully utilized, and *that under existing statutes there is no alternative method of providing such new educational facilities which would be more economical.*" (Emphasis added.)

The Board quarrels with the Commissioner's finding with respect to the subject we have italicized. The Board contends this language means the Commissioner may inquire only as to whether there is some method of *financing* the project more economical than a *bond issue*. Hence, says the Board, the Commissioner had no authority to inquire into the internal economics of the substitute plan and the quality of the educational program it would provide, and then to compare the plan in those terms with the original proposal.

The Board's construction of the statute is strained. If the Legislature had in mind an inquiry merely as to whether there was a method of *financing* more economical than a bond issue, it would hardly call upon the State Commissioner of Education for a decision. His expertise is in other areas. Surely in making the settlement agreement, the parties had no such thought. We say this because upon that view of the statute the submission to the Commissioner would have been an idle thing. First, no one suggested the possibility of a more economical method of *financing*. Second, the Commissioner had already consented to the original proposal for a bond issue, which, upon the Board's present view of the statute, would have been a finding that there was no more economical method of financing. Thus the Commissioner's consent to the substitute plan would have been a foregone conclusion. Quite obviously, the parties understood the Commissioner would make the very inquiry he did make.

The Commissioner's findings were well grounded. Hence the Board cannot escape its duty to proceed with the

original proposal by invoking the agreement of submission to the Commissioner.

## C.

The conclusions we have reached make it unnecessary to consider sundry allegations of error in the conduct of the trial.

## II.

The school board contends plaintiffs failed to exhaust their administrative remedy.

The State Commissioner of Education has jurisdiction to decide "all controversies and disputes arising under the school laws," *R. S.* 18:3–14, subject to further review by the State Board of Education, *N. J. S. A.* 18:3–15.

This statutory scheme has been broadly construed to the end that the judiciary may have the benefit of the special experience of the administrative agencies in this important area. We have no precise precedent, but other decisions readily support the view that the controversy before us comes within the statute. See *Waldor v. Untermann,* 10 *N. J. Super.* 188 *(App. Div.* 1950); *Welsh v. Board of Education,* 7 *N. J. Super.* 141 *(App. Div.* 1950); *Ridgway v. Board of Education,* 88 *N. J. L.* 530 *(Sup. Ct.* 1916); *Montclair v. Baxter, supra* (76 *N. J. L.* 68).

The question therefore is whether we should undo what has been done because plaintiffs did not exhaust the administrative remedy.

*R. R.* 4:88–14 provides:

"Except where it is manifest that the interests of justice require otherwise, proceedings under Rule 4:88 shall not be maintainable, so long as there is available judicial review to a county court or inferior tribunal or administrative review to an administrative agency or tribunal, which has not been exhausted."

The requirement for the exhaustion of the administrative remedy is neither jurisdictional nor absolute in its terms.

*Nolan v. Fitzpatrick*, 9 *N. J.* 477 (1952); *Waldor v. Untermann, supra* (10 *N. J. Super.* 188). The cited rule, which reflects prior decisional law, vests discretion in the trial court to determine whether the interests of justice require that the administrative process be by-passed.

 There is no rigid formula for the exercise of that discretion. *Nolan v. Fitzpatrick, supra* (9 *N. J.,* at *p.* 486). The public interest in a speedy determination may be considered. *Waldor v. Untermann, supra* (10 *N. J. Super.,* at *p.* 191), and *Koven v. Stanley,* 84 *N. J. L.* 446, 447 (*Sup. Ct.* 1913). Here, the need for a prompt solution of a school problem and the possible prejudice from rising building costs, plus the delaying moves which had already beset the program, were weighty considerations in favor of acceptance of the dispute. The amount of administrative expertise involved must also be considered, but although the views of the State agencies would undoubtedly be desirable, the case ultimately involved a question of law concerning the effect to be accorded to the referendum. In these circumstances we cannot quarrel with the trial court's exercise of discretion. Moreover, the court in fact received the benefit of the expertise of the State Commissioner of Education both by reason of his report of June 1960 and his decision upon the application for consent to the substitute plan. Surely the public interest would not be served by rerunning the litigation.

## III.

██ The remaining question is whether the trial court erred in setting aside the Board's resolution directing its attorney to prepare a legislative bill for deconsolidation of the school district.

We assume the attorney was to be specially compensated for that effort. The record is not clear, but the Board presents the issue in those terms, contending it "has the

implied power to expend money to prepare proposed legislation affecting its internal affairs."

The Board relies upon *Reilly v. Ozzard,* 33 *N. J.* 529 (1960), in which we said that local government may seek or oppose legislation affecting its interests (*p.* 544) and may direct its attorney to prepare a legislative bill (*p.* 546). The difference here, however, is that the Legislature did not commit to the school board the power to destroy itself or to recommend its own demise. The sum involved may be small, but if the principle for which the Board contends should be upheld, a school board could as well spend substantial moneys to campaign to the same end. See *Citizens to Protect Public Funds v. Board of Education,* 13 *N. J.* 172 (1953).

The funds of the Board are committed to education within the whole district. Here those funds would be used to advance the interests of but a part of the whole, in response to the sentiment within the Borough to go another way. The Legislature did not authorize a school board to devote public moneys to support factional controversies. If internal dissension should embarrass a board's ability to comply with its public duty, it would be quite enough for it to express that opinion, and leave it to others to finance a movement for legislation. If the governing body of a county or a municipality attempted to draw upon its treasury to finance the effort of a portion to secede from the whole, there could be but one answer. Such is in essence the situation in this case. It is not pretended that the welfare of the children within the Township (or even within the Borough) would be advanced by deconsolidation. Rather a majority of the Board, bound to further the State's duty to all children within the school district, would use moneys, earmarked for that purpose, for the relief of the taxpayers of a part of the district. The resolution was correctly adjudged invalid.

The judgment is accordingly affirmed.

FRANCIS, J. (concurring in result). I concur in the result, and in fact with the entire opinion of the Chief Justice, except the portion designated "III," which plainly goes beyond the needs of the issue before us. That portion declares illegal any effort on the part of a consolidated school district looking toward establishment of a legislative means of making deconsolidation possible, if the effort entails expenditure of money from the education board's treasury. More particularly, the declaration is that if payment of an attorney's fee is required in connection with the attempt, such a board of education cannot direct its attorney to prepare for study and consideration by the Legislature a suggested draft of a statute creating some reasonable procedure to restore the independent autonomy of the constituent municipalities and to permit each of them to provide its own school system. The thesis of the majority is that a consolidated board has no authority to use any portion of the moneys contributed by the taxpayers of the municipal partners to bring about or to attempt to bring about its own demise; that such funds must be employed in furthering the educational interests of the *whole* district and not of an integral *part* thereof. But it does not follow in all cases and under all circumstances that the interests of the whole district are not served by the advocacy of a legislative plan to permit segregation into independent municipal districts. In fact, the contrary may be true; the interests of the whole in some situations may be better promoted by division into self-governing units. Continuance of the union in perpetuity may be harmful to the whole as well as to the parts.

Let me illustrate. Two small municipalities, each unable to support a school system, or perhaps not having enough resident children to warrant an independent system, join to establish a school district. With the passage of years, each municipality experiences tremendous population growth. As a result, all of the members of the consolidated board of education feel that each municipality is

capable of sustaining and ought to have its own school system; that the whole of the district will be benefited by a severance. On learning that the statute is silent as to a means of achieving the desired objective, the members by unanimous vote engage their attorney for a reasonable fee to prepare a suggested form of enabling enactment for submission to the Legislature. Suppose further they agree that the draft shall contain a provision for a referendum on the question in the entire district, and that reasonable safeguards be included for equitable division of existing school property and financial burdens. Under the opinion of the court here, the attorney could not be retained for the purpose—although, if he wished to act without compensation, the board's action would be legal.

Consider another hypothesis: Suppose that shortly after the formation of a consolidated school district and while relations were harmonious, but at a time when there was neither need nor immediate intention to divorce the units, the board members decided without dissenting vote that in anticipation of future growth, or perhaps even future dissension, some legislative machinery for deconsolidation ought to be available. Under the majority opinion they would lack authority to engage their attorney for pay to prepare a proposal for the necessary legislation.

Management of a consolidated school district is committed to the discretion and judgment of the board of education. It seems to me to be well within their official function, as representatives of the entire district, not only to seek correction of what they may conceive to be a legislative oversight, but also to make reasonable expenditure of their operating funds to assist in accomplishing the result. No hard and fast rule is needed, either barring or limiting such expenditures. The ordinary rule of reason ought to provide sufficient safeguard against excesses.

Reference has been made thus far to hypothetical instances where there was unanimity among the board members. My departure from the majority opinion is more

pronounced. Suppose a majority of the board *in good faith* believe that the interest of the district as a whole would be better served by deconsolidation, or, at least, by existence of a means of enabling the people to express a choice on that subject through the ballot. Under our democratic system of government, control of such boards rests in the hands of the majority of its members. There is no sound reason why, in the honest pursuit of that principle, the majority should be prevented from paying its attorney to draft a reasonable statutory plan which, if approved and adopted by the Legislature, will make possible formal expression of the sentiments of the taxpayers as to continuance or deconsolidation of the school district.

For the reasons outlined, in my judgment the *dictum* of the majority does not represent sound doctrine.

The trial court found, and this court agrees, that the majority members of the Board of Education, in engaging its attorney to prepare legislation to bring about deconsolidation, were not acting in the interest of the whole district but on the contrary were consciously serving what they conceived to be the partisan interest of the municipality in which they resided. There is ample evidence to support that finding, and for that reason I concur in the result announced in the opinion of the Chief Justice.

JACOBS, J., joins in this concurrence.

HANEMAN, J. (concurring in result). I join with Justice Francis in his concurring opinion, except so much thereof as would permit the Board to retain counsel by a majority vote rather than by a unanimous vote.

JACOBS, FRANCIS and HANEMAN, JJ., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.