138 N.J. Super. 368 (1975)
351 A.2d 36
BOARD OF EDUCATION OF THE TOWN OF BELVIDERE, NEW JERSEY, PLAINTIFF,
v.
MARGARET E. BOSCO AND BERT CARD, AS CO-CHAIRMEN OF THE CONCERNED CITIZENS FOR THE COMMUNITY OF BELVIDERE, NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided December 10, 1975.
*369 Mr. Robert E. Wade, attorney for plaintiff.
Mr. Gabriel M. Ambrosio, attorney for defendants (Messrs. Ambrosio and Ambrosio, attorneys).
BRY-NILDSEN, J.C.C. Temporarily Assigned.
Plaintiff Board of Education of the Town of Belvidere, New Jersey (a Type II district not having a board of estimate), hereinafter "the board," instituted this action pursuant to the Uniform Declaratory Judgments Act, N.J.S.A. 2A:16-50 et seq. seeking a construction of N.J.S.A. 18A:14-3 and an adjudication of its obligations thereunder.
*370 The matter is submitted for determination as an issue of law. There is no dispute concerning the facts which, briefly, are as follows:
In the discharge of its fundamental duty to provide in its district "suitable educational facilities including proper school buildings and furniture and equipment * * *," N.J.S.A. 18A:33-1 et seq., after extensive preliminary studies the board found a need for additional school building facilities. It then developed a proposal to meet such needs, obtained the necessary approvals of such proposal and, on December 10, 1974, at a special election of the legal voters of Belvidere in accordance with the resolution of the board, the proposal authorizing the construction and furnishing of new school building facilities and providing for the issuance of bonds of the district to an amount not exceeding $4,500,000 to finance the cost thereof was placed upon the ballot. The proposition was approved by a vote of 473 in favor and 281 against. The amount of debt thereby authorized used up the total $832,275.68 borrowing margain of Belvidere, previously available for other improvements, and raised the net debt to $2,780,522.11 beyond such margin. The effect of such debt and the amount by which it exceeded the normal borrowing margin of the municipality was specifically declared in the resolution, notice and upon the ballot. N.J.S.A. 18A:24-24.
On June 20, 1975 the Attorney General of New Jersey approved the legality of the proceedings, pursuant to N.J.S.A. 18A:24-30.
On July 18, 1975, relying upon the December 10, 1974 referendum, the board borrowed $85,000 from the First National Bank of Belvidere, for which it gave its bond anticipation note in that amount on that date, and has used the proceeds of such loan for architectural fees and other legitimate expenses incidental to the proposal. It desires to proceed to completion of the project, being about ready to let the contract out for bids.
On September 9, 1975 defendant Margaret E. Bosco and Bert Card, as co-chairpersons of an organization designating *371 itself as "Concerned Citizens for the Community of Belvidere, New Jersey," presented to the board a "Petition for Referendum" bearing the signatures of some 382 persons purporting to comprise about 40% of the total legal voters of Belvidere qualified to vote in school district elections. In effect, the petition requests the board to adopt a resolution calling for a "Special Election and to submit to the electorate a proposal calling for the repeal or rescission of the referendum of December 10, 1974."
The petition does not cite any specific statute, stating only: "We hereby submit this Petition for Referendum in accordance with the Revised Statutes of New Jersey." Defense counsel in his brief and at oral argument urged that N.J.S.A. 18A:9-6 mandates that since the petition was signed by more than 40% of the qualified voters, the board must place the proposal before the voters at the next annual election or a special election called for the purpose.
The board contends that it has no legal power or authority to accede to defendants' request even were it desirous of doing so, which it has made abundantly clear it is not. It contends that once the matter has been approved by the electorate and its legal regularity certified by the Attorney General, it has no power whatsoever to re-open the matter. The board denies that N.J.S.A. 18A:9-6 applies, but it notes the language of N.J.S.A. 18A:14-3, which it also contends to be inapposite, but regards as having raised a justiciable question.
Defendants filed no answer to plaintiff's complaint nor did they set forth, by affidavit or otherwise, any reasons for the action they petitioned the board to take. One might reasonably assume the reason as being economic rather than educational since there is abroad today a growing fear of inflation, depression and unemployment, not to mention the increasing uncertainty concerning the municipal bond market and the interest rates which might be bid for the Board's bonds. Belvidere is a small community, with little industry and no immediate prospect for any substantial increase in *372 ratables. $4,500,000 would appear to be a relatively large debt for a small community, and its amortization with interest promises a significant annual debt service budget item. When taken along with the current trend of increasing faculty salaries, pensions and other benefits, and the constantly increasing cost of supplies, heating fuel and maintenance, the concern of the people is easily understood. While in December 1974 the same trends were clearly present, many thoughtful people are becoming increasingly insistent upon more conservative governmental spending. However, no economic emergency or major change in conditions peculiar to Belvidere has been brought to the court's attention.
The main thrust of defendants' position is that as members of the electorate they are entitled, as of right, to initiate propositions for submission to the voters of the school district, and that the board is required to conduct a special election for such purpose. Defendants in their brief and in oral argument repeatedly stressed the "democratic right of the people to settle such issues by the ballot," and their appeal to this court is to halt the erosion of the "democratic system" and to preserve the "Constitutional right of the people" to vote on issues of local concern. They assert in general terms that "the voters of Belvidere have the right to decide for themselves whether or not at this point in time they want to have the construction program continued." Moreover, the argument continues, if the people had the right to approve the proposal on December 10, 1974, they have a right to alter the program or to rescind it altogether at this time.
The precise question here presented does not appear to have been treated in any reported opinion in this State, nor have counsel cited a case in point from any other jurisdiction.
The point is glossed over by defendants and treated only in passing by plaintiff, but for the sake of a resolution of the fundamental issue presented, the court assumes that the rights of the bank, the architect and any others who may have advanced funds, performed services or otherwise relied upon *373 the binding validity of the December 10, 1974 approval would be saved harmless in whatever action may hereafter be taken.
The pragmatic value of referenda as means of ascertaining voter sentiment and as a guide to the formulation of legislation and policy making cannot be gainsaid. Moreover, the expression of opinions shared by significant segments of a community by means of petitions signed and submitted by responsible individuals for consideration of legislative and administrative agencies is a practice to be encouraged and worthy of serious consideration by public officials. Nor does this court take issue with the philosophical concept that the source of governmental power is the people, and that government rests upon the consent of the governed. This principle is unequivocally stated in our Constitution:
All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right at all times to alter or reform the same, whenever the public good may require it. [N.J. Const. (1947), Art. I, par. 2]
The right of the people to express themselves in "altering and reforming the same" is reserved in Article IX, Amendments, N.J. Const. (1947), Art. IX (Amendments), §§ 1-7, incl. It is noteworthy that even such a fundamental alteration or moderation as a constitutional amendment can be initiated only in one of the legislative houses, and that not until such proposed amendment has been approved by three-fifths of all of the members of both the Senate and the General Assembly is the proposal to be published and a plebecite held.
In New Jersey, so far as school affairs are concerned, the people's right to referenda is strictly statutory. This is so because in 1947, as they did in 1844, the people of New Jersey adopted a Constitution which by its terms expressly and unequivocally directed that
*374 The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children of the State between the ages of five and eighteen years. [Art. VIII, § IV, par. 1]
This mandatory language was approved and adopted by the people of New Jeresy in a statewide referendum. It is part of the fundamental framework by which the people themselves declared they are to be governed.
One of the traditional and necessary powers of the Legislature is the creation of political subdivisions and the delegation thereto of certain limited functions, subject, of course, to standards sufficiently definitive to guide the exercise of the delegated authority. Pursuant to the mandate of Art. VIII, § IV, par. 1, the Legislature prescribed a comprehensive scheme whereby such education would be furnished by and through a structure of delegated power involving local boards of education, county boards of education, county superintendents, a State Board of Education and the office of the Commissioner of Education, as well as other state and local agencies. It tailored the enabling legislation to be responsive to urban as well as suburban and rural situations while at the same time establishing a statewide policy to guarantee a relatively uniform system throughout the state. As part of this comprehensive plan it created local school districts of the Type II variety to which it gave power to provide, maintain and supervise local schools in a manner consistent with the enabling legislation and the rules of the State Board of Education. See Revised Statutes, Title 18A, in general.
The Legislature has enacted guidelines and has prescribed specific procedures to be followed in the exercise of such delegated powers. One of the powers delegated to local Type II boards of education is the power to create, develop and adopt proposals for the construction of schools and to issue bonds to pay the cost thereof. N.J.S.A. 18A:33-1 et seq. and N.J.S.A. 18A:24-10, 12. It has enacted a specific and somewhat complicated statutory framework to assure *375 that the local boards will strictly conform, step by step, to uniform standards of the State Board of Education (N.J.S.A. 18A:18-2 et seq.), the Office of the Commissioner of Education, as well as other legislatively created agencies. The development of an acceptable building proposal and financing plan, among other things, requires population studies, analysis of available zoning and planning data, the projection of anticipated school population, the determination of a need for additional classrooms and other school space, and necessary furnishings and equipment therefor, the development of physical plans and specifications for such facilities (all of which must be in conformity with state standards governing public school construction, equipment and furnishings), the application for and obtaining of approval of such plans and specifications by the State Board of Education (N.J.S.A. 18A:18-2 et seq.), the formulation of cost estimates to fund the construction, equipment and furnishings of the new facility, the formulation of a plan to finance the construction and, where necessary, the borrowing of funds and the issuance of bonds therefor. The form of such bonds, the amounts thereof, the repayment schedule and interest to be paid, are all subject to strict regulation, supervision and approval by the Commissioner of Education (N.J.S.A. 18A:24-26) and the Local Finance Board (N.J.S.A. 18A:24-27). The law also requires that before a Type II school board may submit a proposal to the electorate for approval, it must obtain from the boards of any sending districts to whom it looks for future tuition to help repay the bonds, a binding commitment to continue to send its pupils for a period of up to ten years (N.J.S.A. 18A:38-20 to 22, incl.). The board met all of these procedural requirements.
Clearly, such a carefully integrated legislative scheme is inconsistent with any ad hoc action by any representative group of electors, and surely a local board of education is not to be encouraged to rescind a program carefully developed in the interest of carrying out the constitutional mandate *376 with which, by legislative delegation, it is charged. Chief Justice Weintraub in Durgin v. Brown, 37 N.J. 189, 198 (1962), in deciding a question of whether a school board might disregard the affirmative referendum and change its mind, held that the final judgment had been committed to the voters. He made it very clear, however, that the power to deal with the problem of preparing and adopting a spefic plan was vested by the Legislature in the school board. N.J.S.A. 18A:33-1 et seq. He went on to say that once the electors had approved the proposal, debate upon the policy was ended. In that case, however, there was no evidence that the electorate would wish to be relieved of its decision.
It is clear to this court that the board, as a local governmental unit, is but a creation of the State, and is capable of exercising only those powers of government granted to it by the Legislature. It is also evident that the right to referendum is strictly a statutory and not a constitutional right. See Botkin v. Westwood, 52 N.J. Super. 416 (App. Div. 1958), app. dism. 28 N.J. 218 (1958), Smith v. Livingston, 106 N.J. Super. 444 (Ch. Div. 1969), Aff'd on Opinion 54 N.J. 525. Unless defendants find support in an affirmative mandatory statute, their effort to compel the board to resubmit this issue to the electorate must fail.
Defendants lay great store by the opinion of Judge Mintz in Smith v. Livingston, supra. This was a zoning case wherein a group of property owners had filed an initiative petition with the municipal clerk seeking to require the governing body to submit an ordinance proposed by them to the electorate to amend certain provisions of the local zoning ordinance. Petitioners relied upon N.J.S.A. 40:69A-191 and 192. The township had adopted certain provisions of the Faulkner Act which rendered the initiative and referendum provisions of N.J.S.A. 40:69A-184 and 185 applicable. In disposing of a number of arguments presented Judge Mintz, after analysing a number of cases, concluded *377 that the Zoning Act, N.J.S.A. 40:55-30 et seq., constituted an exclusive grant of legislative power to the governing bodies of the respective municipalities, preventing others from exercising the power of initiative. "A contrary conclusion," he said, "would disregard the valuable expertise of the planning board, and permit the electorate to defeat the beneficent purpose of the comprehensive zoning ordinance." The court in Smith faced the issue squarely and acknowledged (at 457): "In reaching this conclusion, I am mindful of the fact that N.J.S.A. 40:69A-184 specifically provides that the voters of any municipality may propose `any ordinance'. However, `any ordinance' does not mean `all ordinances.' * * * It seems unlikely that the Legislature intended the possible frustration of comprehensive zoning through the initiative process." This in a case where there was an apparent legislative provision for a binding referendum upon the exercise of the people's initiative. This sort of judicial construction of an issue concerning a system governing the use of property suggests judicial caution in treating any effort to compel action by a board of education wihch might frustrate the comprehensive legislative scheme to provide the equally important system of education for our children. Surely the legislative standards and procedures enacted to regulate the construction and financing of public school facilities is far more complicated and requires the use of far more expertise than the relatively simple procedures governing the formulation and enactment of comprehensive zoning regulations. Moreover, the constitutional authorization granting the Legislature power to enact zoning laws (N.J. Const. (1947), Art. IV, § VI, par. 2) is merely permissive, while the directive to the Legislature to maintain and support a thorough and efficient system of free public schools is clearly mandatory (N.J. Const. (1947), Art. VIII, § IV, par. 1). The reasoning of the Smith case does not appear to support defendants' position.
Defendants' reliance upon N.J.S.A. 18A:9-6 as authority for its position is completely without merit. That *378 section must be read in pari materia with the other statutory provisions contained within Title 18A, Chapter 9, "Classifications and Changes of Classifications of Districts," N.J.S.A. 18A:9-11-11, inclusive) and cannot be interpreted as having any significance outside that context. Its language is explicit and unequivocal and its limitations to procedures involving classification is manifest. Thus it is inapposite to the issue before the court.
Nor does the language of N.J.S.A. 18A:14-3 which the board requests the court to construe appear to bear upon the issue presented by defendants' petition. This statute must also be read in context with the other sections of Title 18A, Chapter 14, Article I (N.J.S.A. 18A:14-1 to 3.2) which are clearly concerned only with annual and special school elections and are not concerned at all with school building or school bonding proposals. For the purpose of this action the court finds that N.J.S.A. 18A:14-3 does not provide a legislative grant of the power of initiative and referendum to the district electorate to compel the board to resubmit to the electorate the proposal approved December 10, 1974, even in a form modified to save harmless the bank and any others who may have relied upon the validity of such approval.
Indeed, the court finds no statutory provision which would return to the people the right by referendum or otherwise, to compel the board to even reconsider the proposal heretofore approved by the district electors at the special election of December 10, 1974. Having thus decided that neither N.J.S.A. 18A:9-6 nor N.J.S.A. 18A:14-3 is applicable, defendants' petition must fail.
This ruling is not to be taken as an approval by this court of the board's contention that it is totally devoid of any power, authority or discretion to heed defendants' request and to reconsider and possibly resubmit this issue to the electorate. This court does not so hold.
As stated earlier in this opinion, the duty to provide suitable educational facilities for the children of Belvidere, *379 including proper school buildings and furniture and equipment, convenience of access thereto, and courses of study suited to the ages and attainments of all pupils between the ages of 5 and 18 years, is placed in the board. So is the power to discharge this duty. Clearly they had the power to adopt the proposition which was submitted to the electorate and approved by it on December 10, 1974. In the opinion of this court that power continues to be vested in the board.
The board relies heavily upon Durgin v. Brown, 37 N.J. 189 (1962). That case treated a different factual situation involving some common legal questions, but it did not hold that once a building proposal and bond issue has been submitted to and approved by a school district electorate that the board is forever thereafter powerless to take any further action with respect to such approved proposal and authorized bond issue. That case was concerned with the recalcitrant majority of the board of a consolidated school district which sought to frustrate a building proposal and bond issue already approved by the electorate. The action was one where plaintiffs sought (1) to compel the Westwood Consolidated School District Board of Education to erect a senior high school in accordance with a proposal therefor already approved by the electorate, and (2) to invalidate a resolution of the board authorizing the board attorneys to prepare a legislative bill for the deconsolidation of the district. The court in Durgin was confronted with the issue of whether a board had authority to institute legislative action to effect deconsolidation. More specifically, the issue in that case was the validity of the action of some of the members of the consolidated board elected from one of the constituent parts of the district and pledged to seek deconsolidation in order to keep the high school in one part of the district, thus frustrating the will of the whole district as expressed in the vote approving the new high school. The court found that the board, even though clothed with power to adopt specific plans regarding school buildings, could not, after voter approval, by the exercise of its own discretion alone, *380 change the plan. In the Durgin case there was no evidence that the majority of the electorate wished to be relieved of its decision to consolidate the district or its approval of the high school building proposal. It was clear that the proposed action was initiated and supported by the electorate of one part of the consolidated district and supported by the members of the consolidated board from that part of the district only. Justice Weintraub held that it was improper in such a situation to rehash the merits of the policy decision which was submitted to the electorate and to decline to fulfill its will because the same or new members of the board later preferred another program, and that the time for the board's decision upon such matters was before the vote. When the voters approved the proposals, the debate upon the policy was ended. Durgin, supra at 198.
However, it would seem that Chief Justice Weintraub, with his characteristic insight into the complexities of legislative construction and application, may have had in mind a situation such as is here suggested when he said:
In these circumstances, the Legislature could hardly have meant that, notwithstanding the election, the Board may change its mind with the freedom it would have if its discretion alone were involved. Rather, we think the Legislature committed the final judgment to the voters.
This is not to say that the vote upon the referendum must be obeyed no matter what may later ensue. We may assume the Legislature intended some residual power to meet the extraordinary or unexpected. One can conceive of supervening events which so nullify the premise upon which the vote was had, that discretion remains in the Board to seek relief from the mandate in the public interest. * * *
Here it is not claimed that something occurred which reasonably suggested that the electorate would wish to be relieved of its decision. [at 198-199]
The good sense of this dictum is apparent and appeals to this court as a logical extension of the rationale of the Durgin court to the problem here presented. See, also, the recent case of Silverman v. Millburn Tp. Bd. of Ed., 134 N.J. Super. 253 (1975), aff'd on o.b. 136 N.J. Super. *381 435 (App. Div. 1975). This court finds that the board, under N.J.S.A. 18A:33-1 et seq. and the very same statutes under which it processed the building plan and bond issue proposal approved by the electorate on December 10, 1974 (which petitioners now desire to be reconsidered by the board and the electorate), has the continuing power and duty to monitor changing circumstances. If, in the reasonable exercise of its discretion, it considers that circumstances have changed so significantly as to suggest that the building proposal and the plan to finance the same, even though conceived in good faith and approved by the electorate a year ago, may no longer be reasonable in the public interest, it may well have not only the power, but the duty as well, to heed petitioners' request and to initiate a review of the proposed project in the light of such changed circumstances. and to determine in such review (using the same procedures as were followed in the original plan heretofore approved) whether indeed some modification of the proposal would at once discharge its obligations under N.J.S.A. 18A:33-1 et seq., and effect the modifications dictated by such changed circumstances as might motivate a review and reconsideration of the matter by the Board. But this is a power and discretion vested by statute in the board alone, and its positive exercise in any direction may not be compelled by the defendants or their co-petitioners.
The court is mindful that such a review and reconsideration would involve delay and administrative difficulty. The court makes no finding and expresses no view with respect to the merits of defendants' position, nor has it any view with regard to the board's proposed determination to proceed under the plan as approved by the electorate. It holds only that the board has the power, at this time, before the contracts are let and the funds are committed (provided, of course, it saves harmless any who have extended credit, furnished materials or performed services in reliance upon the authorized Bond issue), if it finds that present circumstances so warrant, to consider the request of defendants *382 and, following prescribed statutory procedures, take such action by way of modification as it sees fit, with the appropriate state sanctions and, of course, the approval by the electorate. The ultimate form of any revised resolution and the effect upon the original plan resulting from the second election must be considered carefully to avoid confusion and extended litigation. It would seem that sound discretion would dictate that the presently approved program should be disturbed only in the event that the board, in the sound exercise of its discretion, giving due heed to the contentions of those who challenge its present wisdom and necessity, as well as the opinions of others and all available data germane to these questions, is convinced that there are such significant changes in present and prospective conditions that the premises upon which the original proposal was conceived and approved are so changed that the community interest and the long term educational interest of the children of the community will be substantially enhanced by relief from the mandate of December 10, 1974. Unless it so finds, it would seem that the board would be justified in proceeding with the December 10, 1974 approval.