637 A.2d 566

BOARD OF EDUCATION OF THE TOWNSHIP OF COLTS NECK AND THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF COLTS NECK, PLAINTIFFS–RESPONDENTS, v. BOARD OF EDUCATION OF THE FREEHOLD REGIONAL HIGH SCHOOL DISTRICT, DEFENDANT–APPELLANT, AND TOWNSHIP OF FREEHOLD; WILLIAM H. WILLIAMS; TOWNSHIP OF MANALAPAN; BENJAMIN ROSENBERG; TOWNSHIP OF MARLBORO; SAUL G. HORNIK, AND BOROUGH OF FREEHOLD; DEFENDANTS–INTERVENORS–APPELLANTS, AND LYNN REICH, DEFENDANT–INTERVENOR.

Superior Court of New Jersey
Appellate Division

Argued December 8, 1993—Decided February 16, 1994.

Before Judges KING, HAVEY and ARNOLD M. STEIN.

*James E. Collins* argued the cause for appellant Board of Education of the Freehold Regional High School District (*Cerrato,*

*Dawes, Collins, Saker & Brown, P.C.,* attorneys; *Mr. Collins* and *Paul K. Hennessy* on the brief).

*John J. Ross* argued the cause for intervenors-appellants Township of Freehold and William H. Williams (*Lomurro, Davison, Eastman & Munoz,* attorneys; *Duane O. Davison* of counsel and on the brief with *Robert F. Munoz* ).

*John J. Ross* argued the cause for intervenors-appellants Township of Manalapan and Benjamin Rosenberg (*Lomurro, Davison, Eastman & Munoz,* attorneys; *Robert F. Munoz,* of counsel and on the brief).

*Arthur Goldzweig,* attorney for intervenors-appellants Township of Marlboro and Saul G. Hornik, joined in the briefs submitted on behalf of appellants the Board of Education of the Freehold Regional High School District and the Townships of Manalapan and Freehold (*Simon L. Kaufman* on the letter in lieu of brief).

*Richard T. O'Connor,* attorney for intervenor-appellant Borough of Freehold, joined in the briefs submitted on behalf of appellants Board of Education of the Freehold Regional High School District and the Township of Manalapan and Benjamin Rosenberg (*John M. O'Connor* on the letter in lieu of brief).

*Howard M. Newman* argued the cause for respondents (*Kalac, Newman, Lavender & Campbell,* attorneys; *Mr. Newman* on the brief with *Francis J. Campbell* ).

The opinion of the court was delivered by

HAVEY, J.A.D.

Defendant Board of Education of the Freehold Regional High School District [1] (Regional Board) appeals from a March 2, 1993 Chancery Division judgment which permanently enjoins a public

---

[1] The district consists of Freehold, Farmingdale and Englishtown Boroughs and the Townships of Freehold, Howell Manalapan, Marlboro and Colts Neck. The Regional Board oversees five high schools located in Freehold Borough and the Townships of Freehold, Howell, Manalapan and Marlboro.

referendum to "decommit" a new high school in Colts Neck. Construction of the high school had been authorized by the voters in a September 30, 1986 bond issue. The judgment also orders the Regional Board to construct the high school.[2] In a sixty-seven page written opinion dated February 16, 1993, Judge McGann determined that the Regional Board failed to demonstrate sufficient supervening circumstances to justify its avoidance of the September 30, 1986 referendum mandate. We affirm.[3]

We need not relate in detail the abundant facts and complex expert testimony presented by all parties during the bench trial, since they are carefully detailed by Judge McGann in his comprehensive opinion. However, a brief discussion of the relevant procedural history and operative facts is helpful.

In 1984, the Regional Board formed a Special Advisory Committee to study ways to accommodate growing student population in the district. The Committee was comprised of a cross-section of interested citizens, including representatives from each municipality's local board of education and governing bodies.

After preliminary studies conducted by Dr. Michael Macaluso, from the State Department of Education's Bureau of Facility Planning Services, the Committee retained Dr. Emanuel Averbach, highly experienced in long-range planning, education and related fields. Dr. Averbach was accepted by Judge McGann as an expert in "demographic enrollment projections in a long-range facility."

Dr. Averbach presented an extensive study in 1985, updated in 1986, reporting that because of projected increases in student

---

[2] The remaining appellants were granted leave to intervene.

[3] Counsel for the Regional Board acknowledged at oral argument before us that the Board considered, but did not move to transfer this matter to the State Department of Education pursuant to *Rule* 1:13–4(a). *See Abbott v. Burke*, 100 *N.J.* 269, 300–03, 495 *A.2d* 376 (1985) (Court approves of administrative handling by the Commissioner of Education of constitutional and statutory litigation involving controversies arising in the field of education).

population, the district was in need of increasing its "effective capacity" by 1,300 student places. According to Dr. Averbach, in 1985 the district's "effective capacity" was 6,304. The actual student population in 1985 was 7,729 and would increase, according to the witness, to over 8,200 in 1994. "Effective capacity" was generally described by Dr. Averbach as a methodology which, given the educational programs offered, state limitations on class sizes and existing facilities, was the maximum number of students that could be legitimately accommodated. The witness declined to use "functional capacity," a concept employed by the State Department of Education, because the methodology assumed that every space will be filled by students at all times, even if the current educational program does not call for such use.[4]

The Committee accepted Dr. Averbach's analysis and his use of the "effective capacity" methodology. It found that existing facilities were inadequate to meet the present needs of the district and "will be more so in the future due to population pressures and changes in State guidelines." It thereupon presented its report to the Regional Board recommending immediate "construction of a new high school with a capacity of 1300 in classroom space and 1600 in core facilities, to be located in the central eastern section of the Regional District." The Committee also recommended improvements to the district's existing high school facilities. Colts Neck Township, located in the central-eastern part of the district, offered to donate a seventy-acre tract for the new school.

On September 18, 1985, the Regional Board accepted the Committee's recommendations and adopted a resolution authorizing a bonding referendum seeking $30,361,000 for the new school and $6,082,000 for the improvements to the existing schools. The required consent by the State Commissioner of Education was

---

[4] A functional-capacity analysis was conducted by Dr. Irving Peterson for the Regional Board. He concluded that the 1990 functional capacity of the district's high schools was 7,412, which could be increased to 9,200 students by adjusting existing facilities. Judge McGann rejected this approach for the reasons expressed by Dr. Averbach.

given. At the request of the Regional Board, in 1986 Dr. Averbach wrote a background article for a newsletter sent to the voters in the district which mentioned that the present "effective capacity" was 6,304, and the projected average enrollment for 1994 and 1995 would be 8,470. The referendum passed on September 30, 1986, by a vote of 2,950 to 2,042. The $36,443,000 in bonds were sold and Colts Neck conveyed the tract for the new school to the Regional Board.

Plaintiffs in the present action, the Board of Education and Township Committee of Colts Neck, filed their original suit against the Regional Board on January 13, 1989, claiming that the Board intended only to complete the improvements to the existing high schools without constructing the new high school. On February 1, 1989, Judge Selikoff dismissed plaintiffs' complaint, but in doing so relied on the Regional Board's counsel's representation that the Board had no intention of abandoning its referendum mandate to build the new school. By unpublished opinion dated March 7, 1989, we affirmed Judge Selikoff's order of dismissal. (A-2573-88T1).

The Township of Freehold also brought an action against the Regional Board, charging it with failing to monitor purported changes in circumstances following the referendum, and seeking to enjoin construction of the high school pending a new study as to need. The case was settled on condition that the Regional Board obtain a new demographic study.

On September 14, 1989, plaintiffs brought the present action seeking specific performance of the September 30, 1986 referendum mandate to build the new school. On February 21, 1990, after receiving a new demographic report (the Thomas Study), the Regional Board determined by resolution that, because of "a substantial change in circumstances as evidenced by new data and new information," construction of the high school authorized by the referendum be "decommitted." The Board cited two "substantial" changes: (1) the projected 1994-95 school population, according to the Thomas Study, was 7,483, approximately 1,000

students less than projected by Dr. Averbach;[5] and (2) recent relaxation of state regulations permitting the expansion of the existing facilities in the district, rather than construction of a new high school. The Regional Board thereupon scheduled a referendum submitting to the voters its decision to decommission the high school. Judge McGann, in response to plaintiffs' motion, enjoined the referendum pending trial.

After a lengthy bench trial, Judge McGann entered judgment in plaintiffs' favor, permanently enjoining the decommission referendum, ordering the Regional Board of approve the final plans for the new school by June 4, 1993 and retaining jurisdiction in order to monitor the Regional Board's compliance. Citing *Durgin v. Brown,* 37 *N.J.* 189, 198, 180 *A.*2d 136 (1962), the judge concluded that the Regional Board failed to show "exceptional" or "unexpected" supervening events that would justify nullification of the referendum mandate. Specifically, he found that the reduction in the projected enrollment for 1994 and 1995 was a temporary response to the recent recession and did not provide a legal basis to undo the September 30, 1986 referendum vote. The judge noted that it would take approximately three years to build a high school. He found:

> In other words, under anyone's projection (Dr. Babineau's [the Regional Board's expert] figure for 1994–5 was 7493) the Regional District will need substantial additional space soon and the voters have already dictated that it be in a new school in Colts Neck. There is nothing "exceptional" about differences in projections by experts. There is nothing "unexpected" about rises and falls in the economy. No one can predict exactly when they will occur.

The judge also concluded that intervening amendments to State regulations were not sufficiently meaningful to nullify the referendum, and also that there was no factual basis for the Regional Board's and intervenors' claim that Dr. Averbach had "misled" the

---

[5] Dr. Averbach as well amended his projections in 1990 to reflect that the projected student population for 1995 would be 7,712, rather than the 8,200 he projected in 1985.

Board and the public in his 1985 and 1986 reports.[6]

We affirm substantially for the reasons expressed by Judge McGann in his thoughtful opinion. However, since the Regional Board and intervenors raise before us the central question as to burden of proof, we address that issue.

█ The Regional Board and intervenors argue that plaintiffs have the burden of showing that the Board's decommission resolution was an arbitrary, capricious or unreasonable exercise of the Board's governmental discretion. Judge McGann held otherwise, assigning to the Regional Board the burden of showing that supervening events since the referendum justified its nullification. We agree.

█ We do not dispute the settled principle that policy, legislative and quasi-legislative determinations are committed to the judgment of local governmental bodies. *Riggs v. Long Beach Tp.*, 109 *N.J.* 601, 610–11, 538 *A.*2d 808 (1988); *United Advertising Corp. v. Metuchen*, 42 *N.J.* 1, 8, 198 *A.*2d 447 (1964). Such determinations enjoy a distinct presumption of validity, *First Peoples Bank of N.J. v. Medford Tp.*, 126 *N.J.* 413, 418, 599 *A.*2d 1248 (1991); *Hutton Park Gardens v. West Orange Town Council*, 68 *N.J.* 543, 564, 350 *A.*2d 1 (1975), and will remain left undisturbed absent a showing of arbitrary, capricious or unreasonable action on the part of the governmental agency. *Palamar Constr., Inc. v. Pennsauken Tp.*, 196 *N.J.Super.* 241, 250, 482 *A.*2d 174 (App.Div.1983). These principles apply to policy determinations made by local boards of education. *See Parsippany–Troy Hills Educ. Ass'n v. Board of Ed. of Tp. of Parsippany–Troy Hills*, 188 *N.J.Super.* 161, 167, 457 *A.*2d 15 (App.Div.), *certif. denied*, 94 *N.J.* 527, 468 *A.*2d 182 (1983); *Kopera v. Board of Ed. of West Orange*, 60 *N.J.Super.* 288, 294, 158 *A.*2d 842 (App.Div.1960).

---

[6] We denied the Regional Board's motion for a stay, but accelerated the appeal. The Supreme Court also denied the stay, but granted the Board leave to reapply in the event construction of the new school commenced prior to our disposition of the appeal.

However, this case involves a referendum establishing a legal mandate by final judgment of the voters. *Durgin*, 37 *N.J.* at 198, 180 *A.*2d 136. Our Supreme Court in *Durgin* held that once a local board of education submits a question concerning capital improvements to a binding referendum, the board no longer "may change its mind with the freedom it would have if its discretion alone were involved." *Ibid.* Rather, final judgment has been committed to the voters. *Ibid.* "The time for the Board's decision upon such matters was before the vote. When the voters approved the proposals, the debate upon policy was ended." *Ibid.*

However, *Durgin* holds that the board reserves some residual power to "seek relief" from the "extraordinary or unexpected," arising from "supervening events which so nullify the premise upon which" the referendum vote was conducted that governmental action is necessary. *Ibid.* In our view, *Durgin*'s language clearly places the burden upon the local board to show the "extraordinary or unexpected" supervening events necessary to nullify the mandate of the electorate. We do not read the Law Division cases cited by the Regional Board and intervenors as expressing a contrary view. *See Board of Ed. of Tp. of Belvidere v. Bosco*, 138 *N.J.Super.* 368, 381, 351 *A.*2d 36 (Law Div.1975); *Silverman v. Board of Ed. of Millburn Tp.*, 134 *N.J.Super.* 253, 261–62, 339 *A.*2d 233 (Law Div.), *aff'd o.b.*, 136 *N.J.Super.* 435, 346 *A.*2d 611 (App.Div.1975). *Belvidere* was a declaratory judgment action that simply repeated the *Durgin* holding. *Belvidere*, 138 *N.J.Super.* at 380–82, 351 *A.*2d 36. *Silverman* applied *Durgin* to allow a district that had already built a new school to take the easily-reversed step of leasing it for a short period to the State Department of Education for "an educational use consistent with the purposes for which the school was built." *Silverman*, 134 *N.J.Super.* at 261–62, 339 *A.*2d 233.

Our review of the record accords with Judge McGann's ample findings and legal conclusions that the Regional Board did not sustain the burden articulated by the Court in *Durgin*. The judge accepted the opinions of Dr. Averbach over those expressed

by the Regional Board's experts. He noted that of all the competing experts, Dr. Averbach "is possessed of more compelling expertise," who "painstakingly detailed" examination of the "actual functioning" of the existing schools in reaching his conclusions concerning "effective capacity" deficits and the continuing need for a new school. We will not disturb a fact-finder's acceptance of an expert's opinion when, as here, the opinion has factual and statistical support and the expert explains the scientific methodology he applied in reaching his conclusions. *See Landrigan v. Celotex Corp.,* 127 *N.J.* 404, 414–17, 605 *A.*2d 1079 (1992); *County of Middlesex v. Clearwater Village, Inc.,* 163 *N.J.Super.* 166, 173–74, 394 *A.*2d 390 (App.Div.1978), *certif. denied,* 79 *N.J.* 483, 401 *A.*2d 239 (1979); *Double R. Enter. v. Bordentown Tp.,* 12 *N.J.Tax* 455, 466 (Tax 1992).

Judge McGann acknowledged that the actual student population for the years 1990 through 1992 was lower than those projected by Dr. Averbach, and further that the witnesses' projected 1994 population was probably "in excess of the actuality." However, the judge concluded that the difference is one of "degree not of substance." He stated:

> There is no doubt that enrollment will continue to rise. Residential development in the Regional District has continued throughout the recession years but at a greatly reduced rate. The school is not to be built for 1994 or 1995 but to last for many years beyond. There is also no doubt that the end of the recession will cause the residential building rate to soar. The only question is when. In other words, under anyone's projection (Dr. Babineau's figure for 1994–5 was 7493) the Regional District will need substantial additional space soon and the voters have already dictated that it be in a new school in Colts Neck. There is nothing "exceptional" about differences in projections by experts. There is nothing "unexpected" about rises and falls in the economy. No one can predict exactly when they will occur.

As to the Regional Board's argument that intervening amendments to State regulations now permit additions to the existing facilities, rather than construction of a new school, the judge held:

> No proofs were advanced by the Board as to the feasibility of making additions to existing schools to meet increased space needs. No study was undertaken prior to adoption of the "decommit" resolution in any way comparable to that of the Special Advisory Committee. No architectural opinions were sought. The argument does

> not rise to "exceptional or unexpected." It is an afterthought developed during litigation to buttress what the Board had already decided to do.

We agree.

█ The judge's findings are amply supported by substantial credible evidence in the record. *Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). The central question before him was whether the differences in the projections and intervening regulation amendment warranted nullification of the referendum vote. A shift in board policy, fueled by political forces or otherwise, or a change in the voting membership of a local board is not enough. The "extraordinary or unexpected" supervening event must so affect the premise upon which the referendum was held as to compel nullification of it. *Durgin,* 37 *N.J.* at 198, 180 *A.*2d 136. Abundant factual and expert evidence supports the judge's conclusion that the *Durgin* standard was not satisfied.

We recognize that the judge made his findings based on facts and circumstances as of February 1, 1993, rather than as of the February 21, 1990 decommission resolution. He considered trial testimony concerning the inevitable population and enrollment growth in the district as projected to 1999, which would create a considerable gap between projected enrollment and school capacity at the earliest date the new school could open. In effect, Judge McGann updated the premise behind the 1986 referendum to reflect the situation at the time of the 1993 bench trial. He was correct to do so. To have focused on the outlook in February 1990, when the Regional Board decided to decommission, would have ignored present realities and the district's compelling needs in the very near future.

Indeed, the facts reveal that the growth of the gap between enrollment and capacity is greater today than it was presumed to be in 1986. Judge McGann could not ignore those realities in applying the principles of *Durgin.* What the temporary decrease in population showed was an unpredictable flattening of the student population rate due to the recent recession. However, there

was compelling testimony that this trend was temporary and the need for the new school was still readily apparent. Dr. Averbach testified that despite the slow-down in population, and even applying the "functional capacity" methodology, many of the existing school facilities were overcrowded and over-used. Also, the experts were unanimous in their prediction that the student population in the district will probably reach 10,000 in 1999.

We also reject the Regional Board's claim that Dr. Averbach "misled" the Board and the public by his "erroneous" 1985 and 1986 projections, and his use of the "effective capacity" methodology. First, we question, as did Judge McGann, why the Regional Board waited nearly four years before seeking to decommission based on such a claim, particularly when the Board's own counsel as late as February 1989, before Judge Selikoff, represented that the Board had no intention to abandon construction of the new high school. In any event, Judge McGann properly held that Dr. Averbach's 1985 and 1986 student-population projections were not "erroneous" in a legal sense. The witness provided the figures based on a painstaking study, without the benefit of foresight respecting the later recession.

Moreover, it cannot be said that Dr. Averbach's use of "effective capacity" misled the Regional Board or the public. The Committee and the Regional Board made an informed judgment that the "effective capacity" methodology should be utilized, rather than "functional capacity." Committee member Margaret Cardin testified that she and other members discussed the two concepts, understood their differences and unanimously voted to apply the "effective capacity" concept. Also, in reaching its findings the Committee considered the input of Dr. Macaluso as well as the views of the entire Committee membership in reaching its conclusion that the new school in the central-eastern region of the district should "immediately" be built. Given the fact that the Committee and Regional Board knowingly embraced the "effective

capacity" concept, the Board's newly-found claim that it was misled is unpersuasive.

Affirmed.