52 N.J. Super. 416 (1958)
145 A.2d 618
SAMSON BOTKIN, PLAINTIFF-APPELLANT,
v.
MAYOR AND BOROUGH COUNCIL OF THE BOROUGH OF WESTWOOD, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND ALEXANDER ALLAN, COUNTY CLERK OF THE COUNTY OF BERGEN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1958.
Decided October 29, 1958.
Opinion Filed October 31, 1958.
*421 Before Judges SCHETTINO, HALL and GAULKIN.
Mr. Paul T. Huckin argued the cause for plaintiff-appellant (Messrs. Huckin & Huckin, attorneys).
Mr. Bruce H. Losche argued the cause for defendants-respondent Mayor and Borough Council of the Borough of Westwood (Messrs. Bratt & Bratt, attorneys; Mr. George F. Losche, of counsel).
*422 Mr. Milton T. Lasher argued the cause for defendant-respondent Alexander Allan, County Clerk.
Mr. Thomas P. Cook, Deputy Attorney General, appeared on behalf of the State Commissioner of Education, amicus curiae.
The opinion of the court was delivered by HALL, J.A.D.
This appeal involves a fundamental question concerning the legislative division of the powers and responsibilities of government at the municipal level between the local governing body and the board of education.
On September 23, 1958 the Mayor and Council of the Borough of Westwood adopted a resolution requesting the Bergen County Clerk to print upon the official ballots to be used at the general election in the borough on November 4, 1958, the following question as a non-binding referendum (R.S. 19:37-1, as amended):
"Should any action be considered to effect a deconsolidation of the Consolidated School District of Westwood and Washington Township?"
A copy of the resolution was duly filed with the county clerk and he has printed the question on the sample and official ballots. R.S. 19:37-2, as amended.
About three weeks later plaintiff, a borough citizen and taxpayer, commenced this action in lieu of prerogative writ seeking to set aside the resolution as illegal and void and to direct the county clerk to remove the question from the ballot on the principal grounds that the resolution goes beyond the power and authority granted a municipal governing body by the cited statute and constitutes an illegal interference by such body with the affairs of the consolidated school district, a separate and distinct entity.
Plaintiff moved for summary judgment in the Law Division on October 24. The trial court, in view of the time emergency apparently, and most properly, relaxed the rule forbidding such a motion until after the expiration of 20 *423 days from the service of the complaint. R.R. 4:58-1; cf. R.R. 4:88-4; R.R. 1:27A. On the motion affidavits were presented in behalf of plaintiff and the governing body which detailed the situation and its background. No issue of fact was presented thereby and the issue was purely legal. The motion was denied that day.
Plaintiff applied to us on October 27, on proper notice, for leave to appeal. Leave was granted because of the general public importance of the matter. By reason of the very urgent time element counsel for all parties agreed that their oral arguments and briefs on the motion, which thoroughly discussed the merits, should be considered by the court, together with a supplemental memorandum subsequently filed, as their presentation on the appeal itself. The Deputy Attorney General orally expressed to the court the viewpoint of the Commissioner of Education on the issue without objection by any of the parties. We decided the appeal on October 29, one judge dissenting, reversing the order denying plaintiff's motion for summary judgment, directing the entry of a judgment in this court granting the motion to the extent of setting aside the resolution as illegal and void and of ordering the county clerk to remove the public question from the official ballot to be used at the general election on November 4 and further ordering that our mandate should issue forthwith. Since the borough has appealed and the matter will be heard by the Supreme Court on November 3, it is essential that we immediately express the reasons for our decision.
At the outset we consider certain procedural objections raised by the borough, which we find not to be dispositive. It is suggested that the action comes too late and should be dismissed since the county clerk has already printed and delivered the sample and official ballots. (R.S. 19:14-1; 19:14-21, as amended, 24 and 25, as amended; R.S. 19:49-2, as amended.) While this is true, the county clerk says that, since voting machines are used in Bergen County, that portion of the ballot setting forth the question can be removed from the machines without any real practical *424 difficulty. The fact that the sample ballot sets forth a question which will not appear on the official ballot on the machines is not controlling under the circumstances since this is not a case where a change in the ballot at a very late date would add to be voted on a question, candidates or offices not set forth on the sample ballot without sufficient opportunity for the electorate to become informed thereon. Cf. Michaels v. Johnson, 33 N.J. Super. 77, 85 (App. Div. 1954). The borough also suggests that plaintiff should have proceeded under R.S. 19:14-20, as amended, which provides for a summary proceeding to correct an "error" appearing on the ballot copy prepared by the county clerk. The matter involved is not an "error" within the contemplation of that section. Michaels v. Johnson, supra (33 N.J. Super. at page 83). Since the question involved is the fundamental power and authority of the municipal governing body in calling for the referendum, plaintiff's proper remedy was that adopted, namely, a complaint in lieu of prerogative writ to review the underlying resolution.
To consider the basic issue in proper focus, we must, in conjunction with our discussion of it, sketch not only the events in Westwood culminating in the resolution, but also outline the New Jersey statutory scheme for the distinct separation at the local level of the public school system from other municipal governmental functions, in municipalities of the class here concerned. Our decision must rest upon the interpretation of the letter and spirit of the legislative intent as applied to the precise problem before us.
Effective July 1, 1951, Westwood and its neighbor, Washington Township, established a consolidated school district pursuant to the statute (N.J.S.A. 18:5-17.1 to 17.29, inclusive) and the consolidated district has been operative since. Westwood had both a high school and elementary schools; the township had only the latter. The effect of consolidation is to create a single separate entity and body corporate to administer the school systems formerly separately administered by the boards of education of the communities entering into the consolidation. The board of education of *425 the consolidated district gains title to all of the property and assets of the consolidating school districts and is subject to their contracts, debts and other obligations. The consolidated district thereafter has all the powers and duties and is subject to the same restrictions of a so-called "Chapter 7 School District." N.J.S.A. 18:5-17.6.
In New Jersey school districts of whatever classification, though coterminous with municipal boundaries except in cases of consolidated or regional districts, are, and have been for more than half a century, local governmental units, governed by a board of education. R.S. 18:6-21 and 18:7-54. George W. Shaner & Sons v. Board of Education of City of Millville, 6 N.J. Misc. 671, 673 (Sup. Ct. 1928). They are separate, distinct and free from the control of the municipal governing body except to the extent our education law provides. Such freedom is practically complete in the case of Chapter 7 districts; much less so in Chapter 6 districts.
The statutes relating to the latter (R.S. 18:6-1 et seq.) applicable to cities and such other municipalities as may elect to be governed by it, provide for a system where the members of the board of education are appointed by the chief executive officer of the municipal government and annual appropriations, bond issues and other financial matters are determined by a board of school estimate composed of representatives of both the municipal governing body and the board of education.
A Chapter 7 school district, provided for by R.S. 18:7-1 et seq., also applicable to consolidated districts as we have noted, has almost no connections, except mechanical ones, with the local municipal government. This form of district exists in every municipality except cities and even a city may elect to accept its provisions. The governmental mechanics of such a district constitute the most direct democratic form we have in this state. Not only are the members of the board of education elected by the voters at separate school elections held at different times and places than municipal, primary or general elections, but the annual amounts of money to be raised by taxation, the purchase of *426 land, the erection of buildings and the issuance of bonds must all be submitted to and affirmatively authorized by the voters at such elections.
While school taxes in New Jersey are assessed, levied and collected along with all other taxes in one levy by the municipality and not by the school district (in many other states school districts levy and collect their own taxes separately), the municipal authorities act only as a mechanical agent of a Chapter 7 school district in levy, collection and remittance and the governing body may not change by even one cent the school tax amount fixed by the school district voters. The fact that the borough is the collecting agent for school district taxes does not give the slightest basis for intrusion in school affairs. Such a district may also even exceed its own debt limit and invade the borrowing power of the municipality by action of the voters at a school election and without the approval of the local governing body. R.S. 18:5-84 and 18:5-85(a)(3), both as amended.
Our examination of Chapter 7 of Title 18 of the Revised Statutes discloses only one substantial instance where the municipal governing body may exercise any power over school affairs. That is in the case where school district voters have twice rejected a budgetary appropriation submitted at the annual school election, in which event the law provides that the governing body of the municipality shall determine the amount "necessary to provide a thorough and efficient system of schools in the district" for the ensuing school year, which amount shall constitute the tax levy for school purposes. R.S. 18:7-82. This is a most limited function, obviously provided by the Legislature to prevent a breakdown in public education in an extreme situation, and cannot be interpreted to give the governing body any warrant for otherwise intruding upon the administration of school affairs directly or indirectly. (This happened in the consolidated district last February but that fact can give no warrant for municipal intrusion in school affairs at any other time or in any other connection.) In only one other situation does it appear that a governing body may properly *427 express itself in school matters; the governing body as well as the board of education may initiate electoral consideration of a change from a Chapter 6 to a Chapter 7 school district or vice versa. R.S. 18:6-3 and 18:7-3, both as amended. (The right to so change is not granted to a consolidated school district. R.S. 18:6-2 and 18:7-2, both as amended). It is indisputable that the legislative intention is clear beyond question that a Chapter 7 school district shall be completely independent and free from any control or intrusion by the municipal governing body in the affairs committed to its sole sphere. George W. Shaner & Sons v. Board of Education of City of Millville, supra. It is, of course, most fundamental that a local governmental unit, being but a creation of the State, is capable of exercising only those powers of government granted to it by the Legislature. Wagner v. Mayor and Municipal Council of City of Newark, 24 N.J. 467, 474 (1957). This principle is equally applicable with respect to the relation between separate governmental entities at the municipal level. A mayor and council are not omnipotent in all spheres of local government simply because they are the municipal governing body.
Nor do we think the fact that we are concerned with a consolidated school district indicates any different conclusion by reason of the particular circumstances. Such a district can be created only through the initiative action of each board of education interested in the proposed consolidation in calling a special school election to secure the preference of the voters of its district on the proposal. N.J.S.A. 18:5-17.2. A governing body may have no hand in it. The consolidated board membership of nine is apportioned among the participating communities on the basis of population as shown by the last federal census, with reapportionment made each decade. N.J.S.A. 18:5-17.8. The number so apportioned to each community are elected by the voters thereof at annual school elections. N.J.S.A. 18:5-17.9. In our case Westwood elects the great majority of the members since its population by the 1950 census was 6,766 as compared with 1,208 inhabitants for the township. New Jersey Legislative *428 Manual, 1957, p. 238. Total annual tax levies to cover the expenses of running the consolidated system and debt service are determined by the favorable joint vote of the electorate of all participating municipalities at the annual school election. N.J.S.A. 18:5-17.13. The amount thereof apportioned to and to be raised by taxation in each participating municipality is determined by the county board of taxation in accordance with a statutory formula generally based on the ratio of assessed valuations in each to the total in all. In 1958 Westwood's share was 62.26% and the township's 37.74%. Such apportioned amounts are thereafter levied, collected and remitted to the board of the consolidated district by the tax collecting machinery of the respective municipalities. N.J.S.A. 18:5-17.14. The governing body thereof has no more to do with such taxes than where the municipality has its own separate school district.
There is no provision in the statute for dissolution of deconsolidation and it is conceded there is no available present means to accomplish it. The wisdom of the omission thereof is entirely a legislative and not a judicial matter. (The viewpoint expressed at the argument on behalf of the Commissioner of Education that he supports plaintiff's position and would oppose legislation permitting deconsolidation, falls, of course, in the policy field, and can have no significance in our determination of the case.) The Legislature has, by its silence so far, said that the marriage, entered into for better or for worse on the favorable vote of the electorate of each community, cannot be dissolved. A similar absence of provision for dissolution is noted in the statutory provisions relating to regional school districts. R.S. 18:8-1 et seq. But see N.J.S.A. 18:5-1.2 et seq., permitting break-up of a school district originally coterminous with one municipality where that municipality has been divided into two or more.
Since this consolidated school district was established, its school population has substantially increased in common with most other communities. We are not advised whether that increase has been greater proportionately in the borough or *429 in the township. In any event the consolidated district has acquired additional land, built new schools, and enlarged existing ones with voter approval. Its last expansion proproposal was defeated. It is to be resubmitted to the electorate in a few weeks. For the last year or two there has been dissatisfaction with the set-up by a substantial segment of the borough citizenry. No indication is given us of the attitude of the township people, who have a very substantial stake in the joint venture which cannot be brushed aside. While the reason for the discontent is not precisely stated, it can be surmised that many in the borough feel things are working to the financial disadvantage of borough taxpayers. Whether this claimed result is though to be due to the statutory basis of apportionment of expenses between the two municipalities is not stated. In any event there has been increasing agitation in the borough for deconsolidation in which the mayor and council have taken a prominent part.
In 1957 the then mayor appointed a committee composed of two councilmen and other citizens to inquire into the method of bringing about, if advisable, a deconsolidation. In January 1958 the committee held a public meeting in the council chambers at which the Senator from the county was present. A petition was presented to him, signed by approximately 2,200 persons, expressing a desire to bring about a deconsolidation. We presume the signers were citizens of Westwood. If they were all voters eligible to participate in a school election, they represented a very substantial portion of the electorate, for in 1956 the borough cast only 4,032 votes for presidential electors. (New Jersey Legislative Manual, 1957, p. 635). At the meeting the Senator stated that there was no law permitting separation and that he would be unwilling to introduce any enabling legislation designed to permit such (there was no indication whether he was referring to a general or special act) unless the desire to do so was clearly expressed by the voters of Westwood. It may soundly be inferred that the present referendum finds its origin in that statement and constitutes an effort to supply the suggested expression of sentiment. *430 In April 1958 another committee was appointed by the succeeding mayor to study the advantages and disadvantages of school consolidation. The second committee had a conference in the spring of 1958 with representatives of the State Department of Education, who also advised present law did not permit dissolution and that any new legislation should require electorate approval of the precise dissolution plan by the township as well as the borough before it should become effective. The committee submitted a lengthy report to the mayor and council under date of September 12, 1958 but we are not informed as to the conclusion. It is not stated in the record whether appointment of these committees by the mayor was authorized by action of the borough council or whether he merely created them as a citizen on his own initiative. If the former is the case, the governing body was certainly acting beyond its allotted sphere.
Without a doubt the matter of dissolving the consolidated district has become a major community controversy. No indication is given to us of the viewpoint of the members of the consolidated district board of education representing Westwood. It is most significant to note, however, that the matter has become completely embroiled in local partisan politics, since two candidates for the borough council at the ensuing general election, having the same party designation, are urging as a major campaign issue the advocacy of a referendum on deconsolidating the school district. It is very clear that the legislative scheme of separation of school district from governing body has for one of its principal objects the very sound policy of keeping partisan politics out of the administration of local public education as far as possible and to preclude the very kind of political involvement which is now happening in Westwood. The provisions of Chapter 7 are illustrative of this intention. Annual and special school elections must be conducted at different times than primary or general elections. R.S. 18:7-14 and 45. They cannot even be held within 20 days of a regular election. R.S. 18:7-46, as amended L. 1958, c. 113. School elections are called and conducted by the board of education and not *431 through the regular election machinery. R.S. 18:7-15, 16 and 34. Political parties and organizations can have no participation therein. R.S. 18:7-47.10. Candidates for the board of education cannot run with party labels and may not even be grouped on the ballot. R.S. 18:7-30. The aim is clear that the local school system shall be run by the citizens through their elected representatives on the board of education and not by political parties and that the elections of board members shall be on the basis of educational issues and not partisan considerations. That aim is certainly broken down when a referendum on a school question is placed on a general election ballot and candidates for political office campaign on the issue raised by the referendum.
We are certain that this particular referendum question does constitute a prohibited intrusion, under the principles we have stated, in school district affairs by a body which has no business intermeddling with them in the slightest degree except as the legislature has permitted. The question itself is vague and somewhat meaningless in asking whether any action to effect deconsolidation should be "considered." It would appear that the whole matter has already been very thoroughly considered by the study committees. If we construe it really to mean "should any action be undertaken" or "should legislation be sought" to effect deconsolidation, the situation is made no better for, as we have said, the local governing body is not empowered in any way to seek or take any such action in the field of school affairs. As reasons for their respective positions we are urged on the one hand by plaintiff that an affirmative referendum vote would hamper educational administration until the matter of deconsolidation was finally settled and on the other hand by the borough that no real harm can come because a favorable vote would not in and of itself bring about deconsolidation or an intrusion in school affairs and might ultimately benefit Westwood's citizens and that the people should have a right to express their sentiments as to which a court should not interfere. We do not consider that such arguments by either side are of importance in arriving at our decision. As we *432 have pointed out, the issue before us is much more fundamental and must be determined on the broad and basic plane. That segment of the borough's population favoring deconsolidation is not without proper means to raise the question and have it determined. As is usual in a representative form of government, candidates for the consolidated district board of education can run for office on that issue and if there is ultimately elected a majority of the board favoring such action, the board can take steps to attempt to secure legislation or otherwise resolve the problem fairly and in an appropriate manner. It will thereby be considered by the body to which the law has committed such matters. In the meantime local sentiment can undoubtedly be ascertained by interested civic groups or organizations through postal questionnaire or similar means, if such an expression is thought desirable.
It is suggested to us that a legislative intent applicable to the instant situation indicating an exception to the basic principles we have set forth and permitting the present referendum to be sustained is to be found in the broad language of R.S. 19:37-1, as amended, providing for non-binding referenda. The language of that section of the election law reads: "When the governing body of any municipality or of any county desires to ascertain the sentiment of the legal voters of the municipality or county upon any question or policy pertaining to the government or internal affairs thereof * * *," (emphasis supplied), it may adopt an ordinance or resolution to provide for such "at the next ensuing general election." (We may say at this point that we are not called upon to decide whether the statute is broad enough to permit a board of education to call for such a referendum. Offhand it would appear not to do so. There is no comparable or applicable provision in the education law). We are convinced that the quoted section can only be interpreted to mean a question of policy relating to matters in that sphere of government committed by law to and within or related to the powers of the body permitted to call for the referendum. In other words, sentiment can only be asked *433 for with respect to matters concerning or as to which the particular body has the power to act. Any broader interpretation would open the doors without any restriction and would lead to nothing but confusion and turmoil. It would go far beyond the obvious purpose of the device, i.e., to assist the body calling for the vote in determining the course of action it should pursue on a problem or issue before it and within its jurisdiction. Since here the matter of school district deconsolidation is outside the governing body's sphere and it could not act in the matter in any way, the language of the referendum statute itself furnishes no support to the borough's position.
Finally, it is intimated that perhaps the mayor and council could lawfully act in the premises in that it has standing to petition the Legislature under N.J.S.A. 1:6-10 et seq. for the enactment of a special law permitting dissolution of the consolidated district. The cited statute implements the new provision of the Constitution of 1947 (Article IV, Section VII, paragraphs 9 and 10) allowing the passage of private special or local laws regulating the internal affairs "of any municipal corporation formed for local government, or of any county" upon petition of the governing body thereof under procedure to be prescribed by general law.
There are two answers to the suggestion. First, the petition procedure is only available or necessary where the proposed law regulates internal affairs. It was long ago held that the creation or dissolution of a municipal corporation, including a school district, did not amount to regulation of the internal affairs thereof and so a special law to such effect was not in violation of the prohibition of the Constitution of 1844 (Article IV, Section VII, paragraph 11). Howe v. Board of Education of Landis Township School District, 72 N.J.L. 158, 163 (Sup. Ct. 1905); Worthley v. Steen, 43 N.J.L. 542 (Sup. Ct. 1881). This holding remains sound today for the provision of the present Constitution is substantially identical in this respect. Article IV, Section VII, paragraphs 8 and 9. The petition procedure *434 is therefore inapplicable. Secondly, and more important, a municipal governing body may only petition for such legislation regulating its internal affairs and not those of another governmental entity over which it has no power. The same interpretation must be given to these constitutional and statutory provisions as we announced in our discussion of the referendum statute and for the same reasons.
The order denying plaintiff's motion for summary judgment is reversed and judgment is directed to be entered in this court as hereinabove set forth.
GAULKIN, J.A.D. (dissenting).
It seems to me the referendum should be permitted, R.S. 19:37-1.
In July 1951 the Westwood-Washington Township consolidated school district came into being. Prior to that each of the two communities was a separate school district (R.S. 18:5-1, supplanted by L. 1953, c. 417, N.J.S.A. 18:5-1.1). The consolidation, of course, terminated the existence of the separate districts.
A large number of the citizens of Westwood have become dissatisfied with the consolidation. In 1957 the governing body of Westwood took cognizance of this dissatisfaction and (quoting from the borough's affidavit) the then mayor "appointed a committee to inquire into the method of bringing about, if advisable, a deconsolidation. * * * In or about the month of January 1958 that committee held a public meeting at the Council Chamber * * * at which * * * a petition by approximately 2,200 persons interested in bringing about a deconsolidation * * * was presented * * *."
In April 1958 the present mayor appointed a "Mayor's Committee to study the advantages and disadvantages of school consolidation." This committee conferred with representatives of the State Department of Education on May 27, 1958. After concluding its investigations this committee, on September 12, 1958, submitted its report to the mayor and council. In that report was included a summary of the answers given by the State Department of Education *435 to the questions asked by the committee during the interview of May 27. That summary was as follows:
"1. What is the attitude of the State Department of Education toward the possible dissolution of the Westwood Consolidated School District?
Since there is no statutory provision for the dissolution of a consolidated school district such as yours, now, the possibility of deconsolidation would depend upon the State Legislature passing legislation or enabling acts to enable this district to liquidate its partnership.
The State Department of Education would not try to influence the voters in any way  their decision would be final.
However, the legislature probably would refer any future proposed legislation to the State Department of Education for study and recommendations. In this event the department would probably recommend that the legislature provide for:
1. Equitable financial settlement of assets and liabilities.
2. Maintenance of a strong educational program.
Although it is impossible to guess what legislation might be passed, it is reasonable to assume that each of the municipalities in the consolidated district would have to approve a referendum to deconsolidate.
The State Department of Education would like to see the Westwood Consolidated School District problems resolved. Continued controversy over a fundamental problem of this nature is likely to slow down needed developments in the school system.
It is concerned about a possibility that one district or the other might find itself with more classroom facilities than it might need if it were separated.
Historically the department understands some businessmen feel families tend to patronize stores in districts where a high school is located. Although modern parking and shopping center facilities may have decreased the importance of this factor, the department feels the Mayor and Council would want to investigate the possible loss of business in the retail area if deconsolidation were effected.
2. What are the legal aspects of developing legislation to dissolve the district? What would be the procedures, and what conditions would the Borough of Westwood be asked to meet?
Any state senator or assemblyman could introduce the necessary legislation.
Question: Would it be better to have identical bills introduced simultaneously into the two legislative branches, not so much to speed up passage as to eliminate disagreements over wording and provisions in the new bill?
Answer: It is sometimes done.
The department feels it advisable to prepare wholly new legislation rather than an amendment to existing laws. Chapter 5:17 of *436 the existing school laws might provide a framework for new provisions.
In practice, however, many legal snags develop when Chapter 5:17 is applied. It was written long ago and is a patchwork of amendments which might lead to needlessly prolonged court proceedings.
The department cannot comment on conditions that would be imposed on Westwood before enabling legislation was passed and until the voters approved a referendum.
Even if agreement to deconsolidate were reached, the department believes it would be harder to administer the settlement specifications under 5:17 than to pass enabling legislation."
After considering that report the governing body of the borough decided, before tackling the formidable task of obtaining such legislation, to find out (for its own information, and possibly for the information of the Senator from Bergen County who was expected to introduce the legislation) how many of the people of Westwood really wanted it. It does not appear to be disputed that that is the meaning of the question which the governing body asked the county clerk to place on the ballot, pursuant to R.S. 19:37-1.
It seems to me that the basic question here is whether the municipality has the right to take cognizance of its citizens' dissatisfaction and, upon finding that there is no legislation that provides for deconsolidation, whether the municipality has the right to press for corrective legislation. If it has that primary right, then it seems to me the municipality has the incidental right to ask the opinion of its citizens by referendum, before spending its time (and possibly incurring expense) and the time of others in seeking the legislation.
It seems to me clear that the municipality does have that primary right. I do not deny that the cases have held that boards of education are corporate entities separate and distinct from the municipalities whose boundaries they fill, but I believe those cases all dealt with situations in which it was not necessary to look beyond the corporate entities. Nor do I deny that the governing body of a municipality may not interfere with the management and control of the schools by the board of education of the district. But that does not *437 mean that the governing body does not have a legitimate interest in what type of school district should control the schools in its municipality. Cf. Howe v. Board of Education of Landis Township, 72 N.J.L. 158 (Sup. Ct. 1905). Our statutes recognize that the municipalities have such an interest. For example our statutes provide that in most of the school districts of the State there may be a change from one type of school district to another by vote of the voters of the municipality at a general or municipal election called by the governing body of the municipality. N.J.S.A. 18:6-3; N.J.S.A. 18:7-3. These two statutes provide for a change from a Chapter 6 to a Chapter 7 school district or vice versa; and most of the school districts in the State are either Chapter 6 or Chapter 7. Do municipalities with Chapter 6 or Chapter 7 districts have a legitimate interest in the type of school district because the statutes give them the right to change the type of district, or are those municipalities given the right to effect such a change by those statutes because they have a legitimate interest in the cost, efficiency and performance of the schools?
I submit it is the latter. To say that the schools are none of the municipality's concern  that they can never present "any question or policy pertaining to the government" of the municipality, within the meaning of R.S. 19:37-1  seems to me quite unrealistic. After all, the schools deal daily with two of the most vital interests of the people of the municipality  their children and their money. I venture to say that in the vast majority of the municipalities the cost of schools takes the greater part of the taxes collected by the municipality. The municipality is obliged to raise the money to pay the bonds issued by the school district. The borrowing by either eats up the borrowing power of the other (R.S. 18:5-84 et seq.). There is not time to point out the numerous other sections of the statutes which show that frequently the governing body may be compelled to concern itself with the type of school district it has, and may be forced to consider changing it because it has proven inefficient, unduly expensive or unsuited *438 to the needs of the municipality. This may be especially true with reference to consolidated school districts, where developments or happenings in one of the constituent municipalities may throw what is truly an unjust and unforeseen burden on the other.
Where the statutes provide the means with which to change the type of district (as do R.S. 18:6-3; R.S. 18:7-3), whether by action of the municipality or of the district, there is no problem  one merely follows the statutes. But what is to be done when, as here, the statutes do not provide any means for deconsolidation? Must the municipality in such case do nothing?
I do not think so. It seems to me the municipality has the right in such a situation to seek legislation, general or perhaps even special. Cf. Const. 1947, Art. IV, Sec. VII, pars. 8, 9; R.S. 1:6-1 et seq.; Howe v. Board of Education of Landis Township, supra. If it has that right, it has the right to find out how strongly its citizens want a change, and ask their beforehand advice by referendum. Cf. R.S. 1:6-11 to 14.
For the foregoing reasons I would affirm the summary judgment entered in favor of the borough by the trial judge.